Case No. 23-5275 National Association of Mutual Insurance Companies, Avalanche, v. United States Department of Housing and Urban Development, and Maria L. Fauci in her official capacity as Secretary of Housing and Urban Development. Mr. Shanmugam for the Avalanche, Ms. Marcus for the Eppolese. Good morning. Thank you, Judge Henderson, and may it please the Court. In inclusive communities, the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act. But at the same time, the Court cautioned that disparate impact liability under the FHA is limited in key respects, in part because of the constitutional concerns about the government's compelling consideration of race and other protected characteristics. As applied to insurers' rate-making and underwriting decisions, HUD's 2023 rule contravenes the Supreme Court's limitations in two principal respects. First, it would cause race to be used and considered in a pervasive way. And second, it would transgress the requirement that there be a close causal connection between the challenged policy and any alleged disparate impact in light of the limitations that state law imposes on insurers' discretion. The government has blown off those concerns. In 2023, after allowing the 2020 rule to be enjoined, the government simply reinstituted the 2013 rule without any modifications in light of the Supreme Court's intervening decision in inclusive communities. While recognizing some of the problems with the 2023 rule, the district court refused to enjoin it. Because the 2023 rule is inconsistent with the Fair Housing Act, as interpreted by the Supreme Court in inclusive communities, the district court's decision was erroneous and its judgment should be reversed. I'm happy to answer any questions that the court might have on the question of standing, on which the court ordered supplemental briefing. As the court will be aware from our supplemental brief, we rely on two theories. First, the theory that there is self-evident standing here by virtue of the fact that the association's members are directly regulated. And second, we rely on the undisputed evidence that the rule will require the members to incur substantial monetary costs to ensure that their practices comply with the rule's substantive standards. I understand you have all of these affidavits, but in the face of the Supreme Court decision that says it warns again and frowns on the collection of data, particularly as it concerns race, and the Federal Register is replete with not just warnings again, but directions that this in no way requires anyone to collect any information. And the FHA itself has a section that is included in the addendum 3614A that allows the secretary to make rules, including rules for the collection, maintenance, and analysis of appropriate data. And it has not used that. I don't see any requirement, any duty, any likelihood, or anything else of the insurers collecting this data other than this is what they have chosen to do. And so their so-called injury is self-inflicted under CLEVO. Sure. So, Judge Henderson, I'm happy to address that. And in some sense, I think that that also relates to the substance of our first claim concerning the pervasive consideration of race. So I will address that in both respects. I think the core of our argument here is that the disparate impact rule causes insurers to have to collect and then analyze data regarding protected characteristics. And that by doing so, it inflicts the injury on the companies of having to conduct their practices in a different way and in a way that transgresses the limitations of inclusive communities. And I think that at its core, the government's argument on standing in this respect is very similar to their argument concerning our first merits. Their argument is, in essence, that the rule doesn't really change the existing landscape at all, that it really doesn't require us to do anything beyond what the FHA already requires. Now, we think that that argument is incorrect, and we also think that that's a merits argument that is irrelevant to standing. The reason why Clapper is distinguishable, Judge Henderson, for standing purposes is that Clapper involved third parties who were claiming that their communications could potentially be subject to the statutory requirement that they were challenging. And that's where the language concerning self-inflicted injury came into the equation. But here, by contrast, our argument is just the ordinary argument of a regulated party. It is that we are being subjected to new and impermissible restrictions on our conduct. What is it in the rule, in particular, not your semantics, what is in the rule specifically and in particular that runs inconsistent with inclusive communities? Sure. So the government's argument here, I think... What's inconsistent with the written rule and inclusive communities? Sure. So I think we have two arguments, Judge Edwards. The first is that I think that it is our view that any imposition of disparate impact liability on rate making and underwriting decisions by insurers would cause the pervasive consideration of race. But that's not before us. Whether insurers are subject to the disparate impact rate or FHA, that's not before us. Well, just to be clear, the part of our injury here is that the 2023 rule extended unambiguously disparate impact liability to those practices. HUD rejected our efforts to ask for a clear exemption from that. And prior to the 2023 rule, it was not clear that disparate impact liability extended to us at all. You didn't even argue this before, Judge Leon. You didn't say we shouldn't be subject to FHA disparate impact liability at all because we're insurers. That's not before us. Well, to be clear, we made the argument the 2023 rule is violative of the limitations imposed by inclusive communities because it compels a pervasive consideration of race. But not that FHA disparate impact liability doesn't apply to insurers. You never made that argument. That's not before us. So we are not making the argument that the FHA does not apply to insurers, nor are we making the argument that disparate impact liability could not apply to practices other than rate making or underwriting decisions. But to get to my second argument, which is the argument that I think focuses on particular features of the 2023 rule, we certainly think that the way that the burden shifting framework that is adopted in the 2023 rule operates puts this on the end of the spectrum where you have particularly pervasive consideration of race. And it may very well be the case that a more limited rule could comply with that limitation from inclusive communities. I think we would likely take the position. Can you explain why it has to result in pervasive consideration of race? Sure. Why does it have to be pervasive? So I think our view is that when you look at this rule under which, as we understand it, it is not sufficient simply to say we are applying neutral actuarially sound considerations in engaging in the rate making and underwriting process. And by virtue of how the burden shifting framework operates, we can be liable even if the alternative practice that a plaintiff comes forward with is not equally effective. We therefore have to, the members have to transform their practices. And this is set out in some detail in the affidavits. But to give you the cliff notes version of how that would take place, an insurer would have to review its rate making and underwriting process. And where it determines that there is a disparate impact, it would have to take race or protected characteristics into account. How is that different? The rule says? I think that the rule may not formally require it. And that was the sum total of HUD's response in the rule making process was like, look, you can't point to a provision that says you have to consider race. There's no formal requirement. But our principal objection to Judge Leon's reasoning here is that's not what the Supreme Court required. If you look at the relevant language from inclusive communities at 540 and 542, the question is whether or not disparate impact liability causes race to be used and considered any pervasive way. Of course, if it formally required it, that would just ask you, why can't you not do that? And once the claim comes up, then you can look at it and then you can agree or not agree or settle or not settle. But why do you have to completely redo the whole underwriting process? I don't understand. Let me just tell you in a consistent with. I didn't mean to interrupt, but I just want to add this on consistent with what Judge Henderson was suggesting. The first was when I went through this case, my first reaction was it's not right. There's no right claim here. There's nothing. That's why I asked you what in the rule compels what you're suggesting. And you started by saying it doesn't and it doesn't. And there's never been a lawsuit about this all these many years that this has been this terrible issue that's affecting the industry. No one has brought a suit. There's been no kind of contest about it. And we're having trouble seeing how the possibility of liability even arises. That's why Judge Henderson asked you about standing. I don't see how the case, no matter what, standing or not. To my mind, it is not right for our consideration. We do not have, as Supreme Court said in US v. Texas, you know, there's all kinds of possibilities that may result here if it's ever enforced in any way. Let's wait and see how it plays out. First, I'm happy to address that, Judge Edwards. And in the course of that, to address Judge Pan's initial question as well. So, first, this is obviously a pre enforcement facial challenge. We acknowledge that our burden is, therefore, to show that the rule is invalid in all of its applications. I don't understand the government to be framing any objection here in ripeness terms. I don't need the government. Yes, but I understand that it's jurisdictional. So, therefore, I will address it directly. I think that the problem with understanding it in those terms is that it effectively leaves no room for a facial challenge to operate with regard to a challenge to a disparate impact rule. I have to stop you here. This is why I asked you the first question. Facial challenge means I can look at the rule and see your problem. None of the three of us looking at the rule can see your issue. It's not there when you read the rule and you look at inclusive communities. You can't say, well, wait, what is in the rule that is taking issue with inclusive communities or trying to do something different? It's not there. And what you're really saying is this might play out badly for us if we get some bad administrators. They might bring an enforcement action that's not to our liking. And we want to preempt that way in advance. That's exactly why it's not right. So, I would say two things in response to that, Judge Edwards. The first is that I think that with respect, it slightly misapprehends inclusive communities. Because I do think that inclusive communities said that the limitation that the court was articulating, which is, I think, a limitation as a statutory interpretive matter on the availability of disparate impact liability, is a limitation that that liability cannot cause race to be used and considered in a pervasive way. Not that there has to be some formal requirement of that. Frankly, if there was a formal requirement that race be considered, it would probably be unconstitutional. I think for purposes of the court's analysis, what the court was saying is you just have to look at the operation of the disparate impact liability framework. And that's why we came forward with affidavits explaining how disruptive this would be for the practices of insurance companies. And I don't think with respect that it's enough to say, well, look, there haven't been any of these actions. If there are these actions, you can deal with them then. Obviously, insurance companies, like other regulated parties, are going to immediately seek to conform their practices with the requirements here. Now, one of the difficulties with that, Judge Edwards, and I want to bring in our second claim here, is precisely because of the inconsistencies with state law. Even if you don't agree with me that we have made a showing here that as a facial matter, there's going to be a problem because of the pervasive consideration of race, because of the way that the rate making and underwriting process works. I think you do have to look at the requirements of state law for purposes of considering the other important limitation that the court imposed, which is the robust causality requirement. I think that there is agreement between ourselves and the government, and you'll hear from Ms. Marcus in a minute, that if you had a situation in which the states outright banned the consideration of race and other protected characteristics, that you would have a problem under the robust causality requirement. But in your facial challenge, you have to show that every state in every instance brings that causality. Yes, and I think that the disagreement between us and the government is about that. It is about the operation of state law. And we, in our brief, walk through all 50 states and the District of Columbia, and we point out that many, many states affirmatively, explicitly prohibit the consideration of race and other protected characteristics. Other states do so by prohibiting unfairly discriminatory rates and the like. And further, the states have affirmative provisions that set out the factors that insurers can consider in the rate making and underwriting process. And again, remember, going back to what the Supreme Court said in inclusive communities, that all that we have to show is that another source of law, quote, substantially limits the defendant's discretion for purposes of breaking the causal connections. Even if a viable case comes up, when something becomes ripe, that would be the argument you'd make. Wait your day. And what was a little bit confusing about Judge Leon's reasoning is that Judge Leon seemed to suggest that even if state law could always sever the causal connection, that we would have to wait another day. We would have to wait to raise state law as a defense. And again, I think that that really, Judge Edwards, leaves no room for a facial challenge to operate here. And I acknowledge that it is our burden under Hodge versus Talkin and all the other familiar cases to show inconsistency in every application with regard to both of these arguments. But again, I think that we have successfully done so. And again, we point to compliance costs really address this pervasiveness question and why it has to be a pervasive consideration of race. And I'm wondering if you might be able to put this in a concrete example. Like, so, for example, there's there's been a claim that's been referenced in the materials about a claim that insurers are not providing insurance to properties that accept Section 8 housing vouchers. So can you explain like how that. How how your theory of pervasive consideration of race fits into a situation like that. Sure, so that I think is the fact pattern basically of inclusive communities itself. And, you know, I think it involved landlords who did not accept Section 8 vouchers. No, that was like where they're going to locate something. I thought that's what inclusive communities was about. Or am I mixing that up? Yeah, I'm not I'm not sure, but I'm sort of happy to address this in a specific context. So, you know, let's say that insurers take some factor into account in the rate making and underwriting process. For instance, you know, I'm slightly going to section 8 vouchers. That's the that's the example. Yeah. So whatever factor it is, I think insurers would then have to assess whether or not that practice has a disparate impact based on race or other protected characteristics, because that is, after all, the substantive legal standard that is being challenged. But it's not a pervasive look in this particular instance, is it? Because I thought you were saying that. It's going to require the companies to redo the entire way they assess risk. Well, I think what would happen, Judge Pan, is that for that factor or any other factors, say it is whether, you know, the house is in a low lying area, whether the house has a sloping roof or a flat roof. With regard to each of those actuarially sound factors, an insurer would have to consider whether that has a disparate impact on multiple axes, not only with regard to race, but with regard to all of the other stated protected characteristics. If it does, the insurer would presumably have to take those factors into account and essentially redo the rate making the classification and the grouping process in order to come up with a process that was compliant with the legal standard. So how would it work, then, in my example? Like, why couldn't it be that once there's a challenge to this policy, then they could look at it and see if there's something else they could do different? Just charge a higher premium, for example, for a property or whatever. But why would it have to, I guess, happen at the front end and be pervasive as opposed to just case by case? Well, I think the alternative is to basically say, you should just violate the law and wait to be sued. And then when you are sued, you can change your practices. You're assuming so many things that are not here. That's what's so frustrating. And I mean, I don't mean to look frustrated, but I am frustrated. When you say facial challenge, like, Judge, please don't take that opportunity away from us. A facial challenge means I look at the document facially, and I look at one, four, and six, and I say, those requirements are inconsistent with law. The things that you are worrying about aren't stated in the document that you want to challenge. That's why my reaction is, this is not right. You can't point to anything to support a facial challenge because there's nothing in the regulations that is directly inconsistent with inclusive communities. You might get a bad judge. You might get a bad appellate court later on that goes the wrong way, and then you have to fight it out. But facially, it's not there. That's why U.S. v. Texas is precisely the case you need to look at. Again, the Supreme Court says, yes, you can come up with all kinds of hypotheticals that seem worrisome to you, but we're not going to guess now. Let's see if you run into a problem later. I mean, Judge Edwards, I would respectfully disagree. But even if you take that view, and leaving aside for the moment. In my view, that's the Supreme Court's view. Well, even if that is the Supreme Court's view, let me explain why I think we would still satisfy that approach. Now, I want to put aside for the moment our view that it will not surprise you to hear that our client's view is that any application of disparate impact liability to rate-making and underwriting procedures is going to cause a problem for the reasons that Judge Pan and I were discussing. Let's put that aside for a moment. Let's look at the operation. Is that an issue in this case, whether disparate impact can cover your clients? Is that an issue in this case? No, really, wait, because you didn't really answer Judge Pan initially. That's not an issue in this case. Well, so we are challenging the 2023 rule, and one of the effects… No, you're challenging your view of the rule. And one of the things that my colleague asked you is, are you challenging the inclusion of your clients under the impact? And you said no. That's right, you're not. So this is why this makes no sense, what we're doing here. So just to be clear, we have consistently taken the position. Our view is that the imposition of disparate impact liability on these processes is improper. We obviously raised that issue in our objection. And I do think that one way in which the 2023 rule clarified the law was to reject our argument for an exemption and to extend disparate impact liability unambiguously, even to rate-making and underwriting processes. I recognize that the two claims that we are making here are, first, that the 2023 rule requires a pervasive consideration of race, and second, that it fails the robust causality requirement. And I want Judge Edwards to go directly to your question about, with regard to the pervasive consideration of race, what is so problematic about this rule? And I would juxtapose this rule to the 2020 rule precisely because this rule pushes the boat out about as far as it can with regard to the operation of burden shifting. And I would point to a couple of features that I think are particularly problematic. And so if you're looking at this in terms of what is it about the rule in particular that causes the pervasive consideration of race, I would point to two features. The first is that if you look at the second step of the burden shifting framework, it says that the defendant has to show that a challenge practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. And one might very well wonder exactly what that means. But I think that what it means, and you can ask Ms. Marcus this question when she gets up here, is that it isn't enough just to say these are actuarially sound, protected, characteristic, neutral justifications. That what we're doing is what we have always done, which is to rely on actuarially sound factors in the rate making and underwriting process. Now, second, and I think that this may be perhaps the most pernicious part of this, the plaintiff can prevail at the third step. And this is also incorporated in the substantive standard in the previous subsection that, quote, the interest supporting the challenge practice could be served by another practice that has a less discriminatory effect. So it is not that the plaintiffs have to show, as was true under the 2020 rule, that the alternative policy is equally effective. It can be that we can be held liable even if the alternative is less effective. That, in other words, if it doesn't serve the actuarial considerations that underlie the rate making process simply because the alternative has less of a disparate impact. If you won this case and you were allowed to write the opinion, what would your remedy be? What would we say? You are now awarded what? You won your facial challenge, and here's what you're getting. What? You should vacate the rule. Vacate the entire rule. Insofar as it applies to insurer's rate making and underwriting practices. And I think that would be a remedy that would address the concern we're raising. We're not saying that you should vacate the rule as it applies to all insurer practices. You can have other practices with regard to certain pricing discounts or redlining and the like. I think someone could even bring a challenge if they wanted to to practice like bundling. So, in other words, we're not asking for an exemption for insurers from all practices. And that is, I think, the pretty standard APA remedy for a facial challenge like this one. Now, of course, we're operating against the backdrop of the fact that there's a very real likelihood that the 2023 rule will be modified or even superseded once again when the new administration comes in in January. And all I can say about that is that this litigation illustrates the fact that there has been a ping pong on this issue across administrations. I certainly think that a rule like the 2020 rule would reduce the consideration of race because I think that as a practical matter, this is something of a spectrum. The more onerous the disparate impact liability standard is, the more as a practical matter that insurers are going to have to take race into account. In your view, is there anything that we should do to account for the real fact that you have raised that there is going to be a change in administrations? The prior Trump administration adopted a very different rule. Should we perhaps ask the government to state its position with respect to this case on February by February 15th or something like that? I think that would be a very practically reasonable thing for the court to do in light of the fact that the new administration will be coming into office two months from today. And I think I think that the court could promptly issue an order asking the government to state its intentions at that point, recognizing the reality that whatever this court ends up doing, there is a very real prospect of that change. And I do think that if the court does that, it should set a relatively prompt deadline for the government to state its views as to how it wants to proceed. And if we dismiss for one of ripeness, that would have the same result and it would be legally cognizable. It would be something I understand and we do it all the time. And you your position would not be hurt because that is a dismissal without prejudice. We're saying it's not a case that's probably before us. And then whatever it is the government does, it doesn't do. They'll do or don't do. And then you may be where you want to be eventually. But I want to do it in a way that I understand that we are required to do as judges on this court. This case is not right. Judge Edwards, I think what I would say is that I do think that it is telling that the government is not making that argument before this court. It's not the first time that that's happened. The government has lost along with parties on your side of the table. But I think I would also say that I think that we have done precisely what should be done in a facial challenge. When the substantive standard is a standard like the one that the court articulated in inclusive communities. Remember the concern that motivated those last few pages of Justice Kennedy's opinion in inclusive communities. It was the long stated concern that too expansive of a disparate impact standard could raise constitutional concerns. And that is why the court recognized these guardrails on disparate impact liability. And those guardrails, Judge Edwards, require you to look at the practical operation of the provisions. And it was for that reason that we came forward, as Judge Henderson indicated, with the 15 declarations that explain in unrebutted terms the operation of the rate making and underwriting process and the disruptive effects of this rule. I don't think that there was anything more that we could do. And that's why. Those were all tied to this collection of data, which nobody, not only nobody has required, but has frowned on. Well, I think what I would say, Judge Henderson, about that is two things. First, that to the extent that the government sets great store by the fact that there have been no enforcement actions by the government and relatively few private actions in this intervening period. I think that is precisely because of this lingering uncertainty about the law that we've had over the last decade, where there have been challenges both here and in the district court in Chicago on precisely these grounds and others. But I think that the second thing that I would say about this is that I think that as a practical matter, this is the reason why we aren't able to come forward and say we are collecting this data today and analyzing this data today is precisely because the members are in a complete bind here. The members are subject to these state law prohibitions. If you look, for instance, at the Declaration of Genoa Thames, which is at pages 72 to 75 of the Joint Appendix, that company, Harford, operates in Maryland, where there is a specific prohibition on the collection of data of this variety. And so in some sense, the problem that the insurers have right now is the complete uncertainty about the law, which is where our second argument comes in. We believe that there is a conflict in every application between federal law and state law. And, Judge Edwards, you can look at the terms of the laws to make that determination. And all that the government has to offer is the say-so of certain state attorneys general that certain states permit disparate impact liability without any authorities for the proposition that disparate impact liability has been applied to homeowners insurers in this context. So even if you take the most stringent view that you're only going to look at the four corners of the United States Code and state codes, we would prevail on our second claim under that approach. Unless the court has any further questions, I'll reserve the balance of my time for rebuttal. Thank you. Thank you. Ms. Marcus? Thank you. Good morning. I'm Stephanie Marcus from the Department of Justice, and I represent Appalachia's HUD and the acting secretary of HUD. I'm going to start with standing and ripeness. We believe that this case should be dismissed for lack of jurisdiction because the plaintiffs do not have standing and because it is not right. As Judge Henderson, your questions reflect, the plaintiff here has not shown that any of its members have an actual or imminent injury in fact at all, much less one that is traceable to the 2023 rule. The 2023 rule reaffirmed the burden-shifting approach that was first adopted in 2013, and in 11 years, the members have not come forward with anything. They only have speculation that they will do this in the future, but as your honors have pointed out, in the rule itself, HUD expressly disavowed a requirement that anyone has to collect data or use data. But aside from the data collection theories, there's a theory that they are a regulated party, and this rule subjects them to more liability than an alternative version of the rule, like the 2020 rule would. And it's also more stringent than some of the other burden-shifting tests that some of the circuits had previously adopted. So why isn't that enough? As this court has made clear in a number of the cases we cited in our supplemental brief, including the American Chemistry Council and the National Association of Home Builders cases against EPA and the U.S. Corps of Army Engineers, just being a regulated party, that's the object of regulation, is not enough. That doesn't eliminate the article. But I also said the increase in liability to them is a combination of the two. This would be the argument they would make. They are subjected to more liability under this version of the rule than, for example, the 2020 version of the rule. So there are different ways of imposing a standard that implements the FHA's disparate impact framework. I think that the rule doesn't increase the substantive liability under the Fair Housing Act. It doesn't expand liability in any sense from the statute itself. HUD is not purporting to decide. Let's put it this way. It's more for them to prove liability or not under this framework than the alternative frameworks that are available. I mean, the plaintiff has to prove the liability. They just need to defend. But they haven't shown that because they haven't shown any that, again, they actually pointed out in their reply brief that there's never been government enforcement in court against a homeowner insurer. And with the lack of any kind of imminent government enforcement here, it's just a sort of way that HUD administratively will deal with the claims in the administrative process and insurer always has the option to go to federal court. There is if there's a complaint, administrative complaint filed. You're saying they can't make a facial challenge. There's no way in which they can do so. They can only make it as applied challenge. I'm not. I mean, if they're in the future, a party could show some sort of injury. I'm just saying in this case, they cannot make a facial challenge because they haven't shown. You're saying that insurers.  Subject to this. This rule cannot make a facial. They will never be able to show injury. By this, I am not. I don't need to. I'm sorry. I don't think I need to show that they would never. I just saying on the record of this case, they haven't shown injury. I don't know if an insurer in the future could show an injury, but there's nothing on this record. To comply with this rule by by saying, well, now we're going to have to look at this a little bit differently. I know that there's an argument that was coextensive with the FHA, but given that there are different standards that are also permissible, apparently under the FHA, this particular one is going to require them to to maybe. But they can be more careful. The problem with documenting their their work. No, I think. And I think the problem is that they can come into court and argue what they think the FHA burden shifting framework should be. And that and that's why challenges what you're saying. Yes. Again, you're saying they cannot do and they have not. And because they haven't shown that this will cause them any kind of cost, it's that they won't conduct their business any different. And it's also not right because these right now with all these affidavits that say they're going to conduct their business differently. But they don't they just don't even give a time when they're going to do that. And the rule has been in effect for 11 years. I don't see how that harm can be imminent. They didn't update the affidavits there. And they haven't shown today how it's different now. Taking the best I can figure out from their argument, they're suggesting that because of the change in rules, actuarial practices are now more directly implicated in ways that they were not before. That's the best I can get from what they're saying. And that piece of it they're saying the actuarial practices would now be subject to potential liability under their view of the rule. And this is different from what existed before. And it imposes a burden on them now to get ready for that possibility. Your Honor, they can't show that it's different from what it was before because the 2020 rule never went into effect. It was actually enjoined before it became effective by District Court Massachusetts. So the 2013 rule has remained in effect. And so they haven't shown that there's been a change in the standards that they're subject to or that there's been an increase in liability. But in any event, they haven't shown how a rule that doesn't have a substantive requirement. I think it's easy to see the problem with their standing and rightness when you look at the regulated party cases that the District Court relied on in its first opinion and finding standing and how different they are. If you have, for example, a petrochemical manufacturer who is subjected to new pollution standards, that's a substantive requirement that that manufacturer is subject. And so by the rule itself, it affects the regulated party. Same for someone who operates a water system. So why isn't the change not from the 2020 rule to the 2023 rule, but just the 2013 and the 2023 standard versus what happened before? And because there is this argument that this is coextensive with the FHA, but I don't think it necessarily is because there are different versions of the rule that could comply with the FHA. And so then it's just a question of their insurers, right? So they're risk assessors. So they're going to have to do something to comply with litigation risk in light of the standard that they're going to have to meet if they're sued. And they're going to have to, I don't know that has to be a pervasive consideration of race, but they're going to probably make some adjustments to the way they to set their policies based on this rule. And why isn't that enough? Because they're a regulated party that's subjected to the standard. Because to the extent they would do that, that would be because of the Fair Housing Act itself and because of inclusive communities. No, but not because this is different. There are different ways of doing this that are consistent with both inclusive communities and the FHA. I mean, it's subject to debate, but there was the 2020 rule. You could have a rule because inclusive communities has that language about it has to be something that's arbitrary and unnecessary. You could have a rule that says plaintiffs should show at step one it's arbitrary and unnecessary. There are lots of ways to comply with the FHA and inclusive communities that are not this standard. But this is the one that the agency adopted, and they're subject to it. So why don't they have standing? They're subject to it, but they will have a chance in any given case to argue de novo in court. They can't challenge it as a facial challenge. It has to be as applied in your view. But I don't see why that's the case if they have standing to challenge it as a facial challenge based on what I just said. And we think they don't have standing because they need to show that some difference in a burden-shifting framework would cause them to act differently. We have all these affidavits that say that they will. It might not be pervasive, but they're risk managers, and they're going to do stuff to make sure that they're in compliance. But then when are they going to do it? I mean, HUD was just reaffirming a standard that it first adopted in 2013. And even if theoretically there could be some different – and there is. I mean, different circuits have slightly different frameworks. And that's still – they haven't come forward with an affidavit saying that they're doing things differently. One example, it's the Second Circuit actually held that the Supreme Court implicitly adopted the HUD burden-shifting framework in inclusive communities. Have they come forward with a member within the Second Circuit that has done something differently since then or has incurred costs or started pervasively considering race? No. And the rule doesn't require it, and they just simply don't have standing. And it's not right for a lot of the same reasons why their facial challenge fails. Because a lot of the objections they're bringing up, they can argue in an individual case, but it's their burden to show that in every case they would be required to pervasively consider race. And Judge Bates – I think Your Honor was referring to Judge Bates' decision in 2017 in the travelers case with the Section 8 housing. He denied a motion to dismiss on the insurer's behalf. And since that case, they haven't come forward and said, you know, we're doing something differently. Also, an important point in that case, he also refused to dismiss the D.C. law claim. And that's an example where it was allowed to go forward. The case ultimately settled. But all of these, you know, dire predictions of the insurance companies have not come to pass. And we have the Prudential case was in 2002. We have the Vians case in Connecticut that involved a Connecticut claim and a federal claim. Can you address the impending change of administrations and what's the most efficient way for us as a court to deal with this? Well, I think, Your Honor, because our position is that the court does not have standing and the case isn't right, that isn't – I think that isn't effective. That position. And I think it's up to the court. I mean, of course, we are defending the rule and fully defending it. And that is, you know, clearly our position now. And the court knows that this administration is still here through, you know, January 2025. I just think in this particular case, we actually have a Trump era rule that is different from this one, which is a strong indication that there's going to be a change of policy in this case, potentially. And for us to expend the resources to decide this case, whether even on the basis of standing, et cetera, it's a lot of resources. Do you think the rule affects actuarial practices, says anything about it? No, I don't. Well, let me modify that. It makes clear that it is not in any way, like, trying to prohibit risk-based or actuarial practices. It, in fact, says that HUD recognizes that those are legitimate, nondiscriminatory practices. And it's not trying to, you know, do away with those kind of practices. But it certainly does not prohibit them in any way or restrict them. If the court has no further questions, we would ask that it remand the district court to dismiss for lack of jurisdiction or affirm the district court's decision. Thanks. Does he have any time left? Why don't you take two minutes? Great. Thank you, Judge Henderson. Just very briefly on the justiciability arguments. I think a helpful way to think about this is to characterize the 2023 rule as essentially creating a duty, a duty not to engage in practices that create a disparate impact where other less discriminatory alternatives are available, even if those alternatives are not equally effective. And our affidavits showed that the only way to comply with that duty is to modify our practices. And that is why there is self-evident standing. Are you talking about actuarial practices? Yes. I don't think that's what the rule says. That's exactly my concern. You are self-servingly pressing that point as if it's self-evident. When I looked at it initially and listened to this argument for over an hour, that is not what the rule says to me. Even when you shift up and down. Because it would not be, in my view, a discriminatory practice to have the usual business actuarial practices in place for an insurance company to make determinations. I think your argument is bogus, to be very honest with you. I get your concern as business people, and I understand what you're worrying about. But this case just doesn't present anything because the rule doesn't say that those actuarial practices are in jeopardy. It does not say that. And I think that ultimately that is where I have to disagree respectfully with you, Judge Edwards. I don't think that inclusive communities itself requires a formal requirement. It does not require the rule or the underlying statute somehow affirmatively to operate on actuarial practices or to require the consideration of race. And I do think that the colloquy between Judge Pan and my friend, Ms. Marcus, illustrated the problem here. If you take that view to its logical conclusion, I don't think that there is any room for a facial challenge to operate in this context. Any argument would have to be as applied. And that is why I think that this is the paradigmatic context in which we are a directly regulated party. That's a bad thing, you think? We do that all the time. There are lots of cases where you can't get a facial challenge. Look. Why is that problematic? I think it would be true with regard to any challenge of this variety to a disparate impact rule that transgresses the bounds imposed by the Supreme Court. We're just not seeing, we're not on the same page in our understanding of rightness. And if you read, I urge you to read U.S. v. Texas, the Supreme Court said, we're not going to guess about the possibilities. We'll see how it plays out, which would be irresponsible for a court to do that. And that's exactly what I'm saying, especially for someone like me, who can't comprehend your argument that actual warrior practices will fail either under the law, the Supreme Court statement or the rule. Well, Judge Edwards, I think that seems to be your only concern. I think we're talking about this case now. I think we're talking about two slightly different things here. And while I think Ms. Marcus admirably tried to embrace your suggestion that there is a rightness problem here, I start from the proposition that with regard to standing, we are directly regulated parties here. And with regard to rightness, I think that the problem here and I don't want to belabor this. If you disagree with me, we'll have to agree to disagree. But my view on rightness is that in this context, we're bringing a facial challenge. It is entirely permissible. And I'd go all the way back to Abbott Labs on this score to come forward with evidence as to how the rule is going to affect our practices. We do not have to show that that has already taken place. I want to say just a word about the substance of the claims here. And I will be very brief, mindful of the time. I want to say a word about the travelers case, which I think is the case that you were perhaps thinking of, Judge Pan, when you asked your question. We recognize that there may be certain practices by insurers that fall outside the category of rate-making and underwriting practices. I gave the example of redlining. And so, for instance, if you had an insurer who, after the rate-making and underwriting process, said we refuse to provide policies to people who have Section 8 vouchers or we refuse to underwrite policies in a particular neighborhood, those challenges could still go forward. Our view is, with regard to the pervasive consideration of race, that the features of the 2023 rule that we have been discussing are what takes us to the end of the spectrum where the consideration of race is particularly pervasive. The Supreme Court and inclusive communities seem to think that there were certain types of disparate impact liability that would be okay and certain types that would transgress the limit by going too far in mandating the consideration of race. And we think that the 2023 rule is on that end of the spectrum. And, again, I certainly think that it would be appropriate for this court to wait the short period of time to see what the new administration wants to do before ruling on this case. We would ask that the judgment of the district court be reversed. Thank you.
judges: Henderson; Pan; Edwards